COURT OF APPEALS
DECISION
DATED AND FILED

**November 7, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1817**

Cir. Ct. No. **2024TP18**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN RE THE TERMINATION OF PARENTAL RIGHTS TO L.J.L., A PERSON UNDER THE AGE OF 18:

SHEBOYGAN COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

   PETITIONER-RESPONDENT,

 V.

Z.N.,

   RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Sheboygan County: NATASHA L. TORRY, Judge. *Reversed and cause remanded with directions*.

¶1    GROGAN, J.[1]  Z.N. ("Zora")[2] appeals from an order terminating her parental rights to her son, L.J.L ("Luther").  On appeal, Zora argues that the circuit court erred in failing to comply with the federal and state Indian Child Welfare Acts[3] ("ICWA" and "WICWA," respectively) when it required her to appear in person in order to voluntarily consent to the termination of her parental rights.

¶2    She also argues that the circuit court erroneously exercised its discretion when it entered a default judgment against her after she failed to appear in person pursuant to a court order to do so because: (1) her failure to appear in person was neither done in bad faith nor was it egregious; and (2) the court entered default prior to hearing evidence as to grounds contrary to *Evelyn C.R. v. Tykila S.*, 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768.

¶3    This court concludes that the circuit court erroneously exercised its discretion when it granted default judgment against Zora and that the error was not harmless.  This court also concludes that neither ICWA nor WICWA required Zora to appear in person to voluntarily consent to the termination of her parental rights.  Accordingly, the order terminating Zora's parental rights to Luther is reversed, and the cause is remanded for further proceedings consistent with this opinion.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

[2] For readability, this court uses pseudonyms for the mother and child rather than initials.

[3] *See* 25 U.S.C. §§ 1911-1923; WIS. STAT. § 48.028.

## I. BACKGROUND

¶4 Zora gave birth to Luther in September 2021. Zora is a member of the Sault Saint Marie Tribe of Chippewa Indians,[4] and Luther is therefore also eligible for tribal membership.[5] Based on his membership eligibility status, the parties do not dispute that ICWA and its Wisconsin counterpart, WICWA, apply.

¶5 In late August 2024, the Sheboygan County Department of Health & Human Services (DHHS) filed a Petition for Termination of Parental Rights (TPR) alleging grounds for termination existed under WIS. STAT. § 48.415(2)(a) (continuing need of protection or services) and § 48.415(6) (failure to assume parental responsibility). The Petition noted that Luther was found to be a child in need of protection and services (CHIPS) in December 2022 and that a CHIPS Dispositional Order had been entered as a result. The Petition further alleged that Zora had failed to meet the conditions for return, including engaging in certain treatment services, and that she had failed to "engage[] in any services in the past seven months." Additionally, the Petition described Zora's lack of involvement and interest in caring for Luther, stating that Zora "has advised the Department that she does not intend to comply with the CHIPS Order to allow for [Luther]'s safe return to her care[,]" that she "has not visited with [Luther] since October 2023[,]" and that Zora has "advised the Department that she does not wish to participate in visitation with [Luther]."

---

[4] Documents in the Record appear to use "Sault Saint Marie Tribe of Chippewa Indians" and "Sault Tribe of Chippewa Indians" interchangeably.

[5] A caseworker for the Sault Tribe of Chippewa Indians testified at the February 27, 2025 hearing and confirmed that Luther is eligible for tribal membership. She was unable to confirm Luther's actual enrollment status at the time of the hearing due to an issue with their computer systems. Luther's eligibility for enrollment is undisputed.

¶6    At some point following the filing of this matter, Zora moved from Wisconsin to Michigan's Upper Peninsula because the father of one of her children, with whom she was in a relationship, was attending Northern Michigan University.   Zora therefore appeared before the circuit court via Zoom at the October 1, 2024 initial appearance while her attorney appeared in person.  At that hearing, Zora's attorney entered denials to the two counts alleged in the Petition on her behalf; however, he also informed the court that Zora may ultimately be willing to proceed with a voluntary termination of parental rights in regard to Luther.  Zora again appeared remotely via Zoom on October 31, 2024, with her counsel appearing in person, at which time Zora's attorney confirmed that Zora "wants to do a voluntary TPR," and the court scheduled a disposition hearing for January 9, 2025.  The disposition hearing was later adjourned to January 23, 2025, at Zora's request.

¶7    Prior to the January 23rd disposition hearing, Zora filed a three-page "Consent to Terminate Parental Rights" (the Written Consent) with the circuit court in which she confirmed she "consent[ed] to the termination of [her] parental rights to [Luther] … pursuant to WIS. STAT. § 48.41 and WIS. STAT. § 48.028(5)(b)."   (Formatting altered.)   The Written Consent also included sections entitled "Background," which described Zora's personal information and history; "Termination of Parental Rights," which confirmed she had reviewed the Petition and wished to proceed with the voluntarily termination; "Waiver of Rights" and "Consequences of Waiver," which listed various rights Zora confirmed she was aware she would have in an involuntary TPR proceeding, that she waived those rights, and that she understood the consequences of terminating her parental rights to Luther; "Relief Before/After Judgment," confirming she understood her rights under § 48.028(5)-(6), WIS. STAT. § 48.46(2), and 25 U.S.C.

4

§§ 1911-1913; and "Consent to Termination," which confirmed she had reviewed the information with her attorney, that she consented to the voluntary TPR, and that she wanted "the court to accept [her] consent and enter an order terminating [her] parental rights." (Formatting altered.) The Written Consent contains what appears to be Zora's signature—both typed and written—along with her attorney's signature, with both parties' purported signatures bearing the date January 21, 2025.

¶8 Zora again appeared remotely via Zoom while her counsel appeared in person on her behalf at the January 23rd dispositional hearing. The circuit court began by informing the parties that going forward, it would "have to have a … different policy regarding attorneys asking for remote appearances because" although "trying to be accommodating," it had approved of Zora's remote appearance "last minute." The court went on to explain that although the hearing had been scheduled for disposition and that it "understood [Zora] wanted to get this resolved," because "this is an Indian Child Welfare Act case[,] [s]he has to be here in person." The court explained that Zora needed to appear in person because "[t]here's a specific form that needs to be completed that [Zora] has to sign in front of me and then I have to sign an order form indicating that she did review that and sign it in front of me." The court did not reference a specific statute requiring Zora's appearance in person; however, it referenced form IW-1637 as being the form Zora was required to sign in person before the court. Based on its conclusion that Zora was required to sign that specific form in the court's presence, the court stated it could not proceed "until [Zora] is in the courtroom in person signing that form in front of me."

¶9 Following the circuit court's pronouncement that Zora was required to appear in person to sign a specific form to voluntarily consent to the termination

5

of her parental rights in light of this being an ICWA case, Zora's counsel explained to the court that it would "be difficult for" Zora to appear in person because she lived slightly under four hours away in Michigan's Upper Peninsula. Counsel noted, however, that Zora was scheduled to appear in Sheboygan County for a mid-February trial in a TPR case concerning one of her other children, and ultimately, the court scheduled a hearing for the noon hour on February 19, 2025, to coincide with that timing. The court thereafter signed an Order to Appear requiring Zora to appear in person at the February 19th hearing, and the Order further stated: "**Failure to appear may result in the Court entering a judgment of default against the above-named party.**" An Affidavit of Service filed on February 3, 2025, indicates the Order was personally served on Zora at an address in Michigan on January 26, 2025.

¶10 On February 13, 2025—six days prior to the date Zora was ordered to appear before the circuit court in person to sign the voluntary TPR form—Zora's counsel filed a letter with the court explaining she would no longer be available to appear in person on the scheduled February 19th court date. Counsel explained that the individual who was available to transport Zora to Sheboygan County for her February 17-18th trial in her other TPR case was now required to appear before a court in Marquette County, Michigan, at 9:30am on February 19, 2025, which counsel had confirmed using Michigan's case search tool. Accordingly, he explained, Zora would need to return to Michigan with this individual on February 18th at the conclusion of her TPR trial. Counsel then went on to suggest multiple alternatives that would allow Zora to sign the voluntary TPR form in person: (1) rescheduling the hearing for the afternoon of February 18th if all parties were available; (2) rescheduling during the lunch hour or during another available time period on February 17th or 18th; (3) rescheduling

to a later date; or (4) "authorizing another judge who is available on the 17th/18th to conduct the hearing." Counsel concluded by reiterating that he "hope[d] that we can avoid a default judgment" because Zora "intends to voluntarily terminate her parental rights to [Luther]" and explained that "[a]n involuntary termination due to a default judgment could have significant ramifications in the future for [Zora] (see WIS. STAT. § 48.415(10))." Four days later—and two days before the scheduled February 19th hearing—counsel filed a follow-up later asking the court to disregard the prior letter "except insofar as it requests that the dispositional hearing be rescheduled to a later date" due to Zora's February 17-18th trial in her other Sheboygan County case having been adjourned.

¶11 Although Zora did not appear at the February 19, 2025 hearing either in person or remotely via Zoom, her attorney appeared on her behalf. At the outset, the circuit court acknowledged receipt of Zora's request to adjourn due to her inability to secure transportation; however, it went on to question Zora's attorney as to whether "there [was] any reason why [Zora] didn't make arrangements to have other transportation" since it had been "six days" since she informed the court she would not have transportation for the scheduled hearing. Zora's counsel explained that Zora has very little, if any, familial support and that she "did not really have any other options since" the individual who was initially going to be available "was not available to take her" due to his own personal circumstances. Apparently unsatisfied with that response, the court stated: "Well there is public transportation" and then questioned counsel as to the extent of discussions counsel had had with Zora regarding alternate transportation options. Counsel confirmed he had asked Zora if any other individuals were available to bring her to Sheboygan County but stated he had not discussed public transportation options and explained that he had not looked into whether public

transportation was even a possibility from her location in the Upper Peninsula to Sheboygan County. In response, the court explained that "there was an order to appear served on her" and "noted in looking at the file … that [Zora] has never appeared in person in this case" and that in "[e]ach previous hearing, she's always been via video."

¶12 Following this exchange with Zora's counsel, the circuit court inquired as to how DHHS wished to proceed, and DHHS's counsel asked "that the Court move forward" and explained how counsel believed "this should work[.]" Counsel began by explaining that Zora "left town for Michigan in November after this case was started[,]" that "[s]he knew she had this case pending[,]" and that although Zora "had been served with an order to appear," "[s]he hasn't made any of the hearings."[6] DHHS's counsel went to on to state:

> I recognize some accommodations may need to be made. But of course that needs to be balanced against the need to expeditiously provide permanency for these children -- or in this case, child.
>
> So it's the public's position -- she was served with the order to appear. She's aware of today's hearing. She's failed to make any effort to appear. And in light of that, I believe she's in default. Procedurally, what I think now has to happen is that I would file a motion for default under Section 48.23(2)(b)(3).
>
> We would schedule that motion hearing. [Zora] would have the opportunity to appear in person and explain why she failed to appear. If at that time the Court finds that her conduct in failing to appear in person as ordered was egregious and without clear and justifiable excuse, I believe she may be held in default.

---

[6] Presumably, counsel meant that Zora had not "made any of the hearings" *in person* as the Record clearly establishes that Zora did appear at prior hearings via Zoom.

And if the Court makes that finding under that statutory section I cited, a dispositional hearing on the termination of parental rights may not be held until at least two days have elapsed since the date of the that finding.

So we're really looking at I believe two more hearings: One to default [Zora] if she fails to appear; and then one for disposition. And I would file a motion for default because I believe that's the appropriate course of action at this point.

She's failed to appear. She's failed to provide the Court any explanation in person as to why she couldn't find some transportation here. She certainly has in the past found plenty of transportation to leave the state and go to Michigan.

The court noted it "was not under the impression that [DHHS] would have to file a motion for default[,]" and counsel explained that "[w]hen there's an order to appear, if a parent fails to appear, a motion is filed to allow a parent to respond and explain why they have failed to appear and to determine whether their conduct in failing to appear is unjustifiable and egregious. And then the default is granted." Luther's Guardian Ad Litem (GAL) voiced agreement with DHHS's request. In light of these requests, the court explained to Zora's counsel that "in a way" he would be "getting [his] request" because Zora would have another opportunity to appear in person at a hearing scheduled for February 25th.

¶13 Following the February 19th hearing, DHHS filed a motion for default pursuant to WIS. STAT. §§ 805.03 and 48.23(2)(b)(3). In particular, DHHS asserted that § 805.03 permits a circuit court to "make such orders as are just when a party fails to obey" a court order, which it said includes "granting default judgment as a sanction against a parent in a termination of rights case when the parent fails to appear as ordered[,]" and that § 48.23(2)(b)(3) "provides that a parent is presumed to have waived … her right to counsel and to appear by counsel if the court ordered the parent to appear at a hearing, the parent fails to

9

then appear at the hearing, and the court finds that the parent's conduct in failing to appear was egregious and without clear and justifiable excuse."

¶14 In response, Zora's counsel filed a memorandum requesting that Zora be allowed to appear via Zoom for the purpose of voluntarily consenting to her termination of her parental rights. In that memorandum, Zora asserted that neither ICWA nor the Wisconsin statutes required her to appear in person to do so. Specifically, counsel noted that although the circuit court had seemingly concluded Zora was required to appear in person to voluntarily consent to termination of parental rights based on form IW-1637, the relevant language in 25 U.S.C. § 1913(a) and WIS. STAT. § 48.028(5)(b),[7] which contain nearly identical language, was ambiguous and was most reasonably construed in Zora's favor. Counsel explained that there did not appear to be any controlling precedent; however, it cited a tribal court judicial decision, *In re B.A.*, 3 Am. Tribal Law 39, (Tribal Court of the Confederated Tribes of the Grand Ronde Community 2001), which held that although telephonic appearances were impermissible, "[a]n exception to actual presence of a parent in the Courtroom might be made" and offered video appearances as a possible option. *Id.* at 41.

¶15 Zora again did not appear in person at the February 25th hearing; however, she did appear remotely via Zoom, and her counsel appeared in person on her behalf.[8] The circuit court noted that it had received Zora's memorandum

---

[7] Counsel pointed to the phrases "executed in writing," "recorded before a judge," and "accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian."

[8] Multiple parties, in fact, appeared via Zoom at that hearing—DHHS's counsel, the GAL, the Sault Tribe of Chippewa Indian's caseworker, the placement provider, and Zora. Only Zora's attorney and the DHHS social worker appeared in person.

requesting that she be allowed to consent to the TPR via Zoom; however, the court confirmed its "position … that [Zora] needs to appear in person." Although DHHS's counsel did not take a position as to Zora's request, counsel asked that the court enter a default judgment against Zora if it was choosing not to allow her to appear and consent remotely. The GAL did not object to Zora's request and asserted allowing her to do so would be "cleaner" but understood if the court did not "want to set precedence" by allowing parties to appear remotely after being ordered to appear in person. In considering the default motion, the court explained:

> Okay. And as I've indicated, I understand that she's here [via Zoom]. This is a closed proceeding. I'm not going to remove her from the Zoom chat. But I -- the Court does take a position that due to the fact that this is an Indian Child Welfare Act case, that [Zora] does need to appear in person in order for her to sign the consent to terminate parental rights in front of me. I am aware that she did sign a version that was not the form that would be prescribed under the Indian Child Welfare Act.

> We have made arrangements for [Zora] to appear. We have had several court dates in order to make it convenient for her to appear. At our last date we even had this set over the noon hour because that was when it would have been most convenient for her schedule. This Court does not schedule things in the lunch hour. And I have not heard of any explanation that I think would be credible as to why she is not present today.[9] Why she has not made arrangements to be present in court.

In response, Zora's counsel argued that pursuant to *Dane County DHS v. Mable K.*, 2013 WI 28, ¶70, 346 Wis. 2d 396, 828 N.W.2d 193, a WIS. STAT. § 805.03 default judgment in TPR proceedings should only be granted in the event of bad

---

[9] The circuit court's reference to Zora "not [being] present today" at the February 25th hearing was presumably in reference to Zora not being *physically* present as the transcript from that hearing explicitly notes that Zora appeared "via Zoom."

faith or egregious conduct, neither of which counsel believed to be present here. Specifically, counsel explained that according to Google Maps, Zora faced a nearly four-hour drive each way, that she has neither a vehicle nor a driver's license, that she has no family support, and that she has attended remotely when allowed to do so. Counsel also explained that these proceedings did not prohibit Zora from moving to Michigan and that she had done so because "the father of her younger child is now enrolled at Northern Michigan University" and that they were in a relationship.

¶16 Ultimately, the circuit court granted the default judgment. After recounting the January 23rd hearing at which it ordered Zora to appear in person for the February 19th hearing and noting Zora's failure to appear in person at the February 19 hearing, the court stated:

> And I am provided with the explanation that she didn't appear because she lives in Michigan. That was the fact apparently that had been in effect for quite a while. It was clearly in effect on the date, January 23rd, when the February 19th court date was set and when it was clear that she was expected to be in person. There has been no other alternative date provided for when she would be here just that the Court should not expect her to be in person and that the statute just really doesn't mean that or just shouldn't be complied with.[10]

> And so I do think the fact that she indicated on January 23rd that she could and would be here on February 19th and that was why the Court then set proceedings for that date and time and then she did not appear is a demonstration of bad faith. I do think it's egregious. I do think that it's -- without clear -- and it's not a clear or justifiable excuse to say that because she lives three and a half or three hours and forty-five minutes away that she should never be expected to be in court, in person.

---

[10] As will be explained more fully below, the circuit court's interpretation or understanding as to what was required under ICWA and WICWA was actually incorrect.

> She was expected to be in court, in person. She was served with an order to appear and did not appear. And so I will be granting the default judgment against her for failing to appear at that hearing.

The circuit court did not hear any testimony as to grounds for termination of parental rights prior to entering the default judgment. Instead, it scheduled a hearing for February 27, 2025, to do so.

¶17 The matter proceeded to disposition at the February 27th hearing. Zora's counsel appeared in person on her behalf; Zora, however, did not participate in the hearing. Two witnesses testified at the hearing—Heather Hening, a DHHS social worker, and Heidi Nesberg, a caseworker for the Sault Tribe of Chippewa Indians. Zora's counsel did not have questions for either witness.

¶18 Generally, Hening confirmed she had been assigned to Luther's case, that she had prepared the TPR Petition, and that she believed the Petition "fully discloses information relevant to the decisions the Court has to make, not only related to grounds but also to disposition[.]" Hening also confirmed that Zora had failed to comply with the conditions of return such as (but not limited to) cooperating with the social worker, completing a psychological evaluation and following various treatment recommendations, and participating in supervised visits, and she further testified that Zora had last seen Luther in October 2023 and that Zora had informed her in May 2024 that she would not be attempting to meet the conditions of return. When asked whether she was aware of Zora having "taken any responsibility … to participate in decision-making about [Luther]" such as "medical care decision-making, education … any care decision about him or for him on a day-to-day basis[,]" Hening responded "[n]o, she has not" and confirmed that Zora also had not shown any interest in doing so. As to the

relationship between Zora and Luther, Hening described the relationship as "absent[,]" although she did acknowledge that Luther's foster mother had sent Zora pictures. In light of her familiarity with Zora and Luther, Hening did not believe severing the parent-child relationship would be harmful to Luther.

¶19    Following Hening's testimony, the circuit court briefly questioned Nesberg, the Sault Tribe of Chippewa Indian's caseworker. Nesberg confirmed that Luther was eligible for tribal membership but could not confirm his actual enrollment status because the tribe's computer systems had been hacked. When asked about her involvement in these proceedings, as well as in the underlying CHIPS matter, Nesberg explained that she was "the monitoring worker," that tribal resources had been considered for Luther but that no tribal placements were available, and that she had had discussions with the individuals who would generally make recommendations regarding TPR-type cases and that those individuals "have made a recommendation in support of termination of [Zora's] parental rights." Nesberg further confirmed that the Tribe supported Luther's continued placement in his current foster home and explained that the Tribe does not "make a recommendation on the adoptive placement until after termination occurs." When asked if she had anything additional to add to her testimony, Nesberg reaffirmed "that active efforts have been made to achieve reunification with [Zora,]" that "[t]hose efforts have been unsuccessful[,]" that Zora "has made … zero progress on this case[,]" that Zora had "abandoned [Luther,]" that Zora had not visited Luther "since October 2023[,]" and that Luther "would be at risk of serious harm if he were returned to [Zora's] care."

¶20    Following argument from counsel, the circuit court found that grounds to terminate Zora's parental rights existed based on abandonment, continuing CHIPS, and failure to assume parental responsibility, and it further

14

found that termination of parental benefits would be in Luther's best interest. As relevant,[11] the entirety of the court's remarks, which comprise approximately one page of the relevant transcript, are as follows:

> All right. Thank you. Well, we have had several proceedings in this matter over the termination of rights ... And in regards to [Zora], I found that she had defaulted. We set this date technically for disposition and for also an opportunity for the department to give the grounds testimony.
>
> Again [Zora] is the mother of [Luther] and there has been notice provided … by personal service to the mother. There has been no declaration of parental interests. We do not have any idea who the father might be.
>
> Based on the testimony today, I do find that the parental rights of [Zora] are -- are terminated based on grounds of abandonment, continuing need of protection or services, as well as failure to assume parental responsibility. Again she was found -- both parents were found in default and we did have an evidentiary hearing today establishing those grounds. There have been active efforts made to provide the remedial services and rehabilitation and those were not effective. I do find that the mother is unfit and that it is in the best interest of the child that the parental rights be terminated.

The court thereafter entered an order terminating Zora's parental rights.[12] Zora appeals.

---

[11] Some of the circuit court's comments were specifically in regard to the termination of parental rights as to Luther's unknown father, whose rights are not at issue on appeal.

[12] The initial order terminating Zora's parental rights, filed on March 4, 2025, reflects abandonment, continuing CHIPS, and failure to assume parental responsibility as the grounds for termination. The circuit court signed an amended order, filed on April 4, 2025, removing the abandonment ground.

## II.  STANDARD OF REVIEW

¶21    "The decision whether to enter a default judgment is a matter within the sound discretion of the circuit court."  *Evelyn C.R.*, 246 Wis. 2d 1, ¶18 (citing *Shirk v. Bowling, Inc.*, 2001 WI 36, ¶9, 242 Wis. 2d 153, 624 N.W.2d 375).  "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach."  *Mable K.*, 346 Wis. 2d 396, ¶39.  Whether a circuit court erroneously exercises its discretion is a question of law this court reviews de novo.  *See id.*; *see also Evelyn C.R.*, 246 Wis. 2d 1, ¶18.

¶22    If "the circuit court erroneously exercised its discretion in granting a default judgment finding that grounds existed to terminate [a parent's] parental rights, [this court] must then examine whether the circuit court's remedy is fundamentally fair under these facts."  *Mable K.*, 346 Wis. 2d 396, ¶40.  "Whether a circuit court has provided a parent in a [TPR] proceeding fundamentally fair procedures also presents a question of law" this court "review[s] independent of the determinations of the circuit court[.]"  *Id.*

¶23    Whether the circuit court correctly interpreted ICWA's and WICWA's requirements where a parent wishes to proceed with a voluntary termination of parental rights involves statutory interpretation.  "[S]tatutory interpretation and application … present questions of law" this court reviews de novo.  *State v. Novy*, 2013 WI 23, ¶21, 346 Wis. 2d 289, 827 N.W.2d 610; *State v. Lickes*, 2020 WI App 59, ¶16, 394 Wis. 2d 161, 949 N.W.2d 623, *aff'd*, 2021 WI 60, 397 Wis. 2d 586, 960 N.W.2d 855; *State v. H.C.*, 2025 WI 20, ¶13, 416 Wis. 2d 233, 21 N.W.3d 330.

## III. DISCUSSION

¶24     This appeal requires consideration of two issues—first, whether the circuit court erroneously exercised its discretion when it granted default judgment against Zora for failing to comply with an order to appear in person and, if so, whether such error was harmless, and second, whether the court erroneously interpreted ICWA and WICWA in concluding that Zora was required to appear in person in order to voluntarily consent to the termination of her parental rights.

¶25     Zora challenges both the circuit court's grant of default judgment and its conclusion that ICWA and the corresponding WICWA statutes required her to appear in person to voluntarily consent to the termination of her parental rights.[13]  As to the court's grant of default judgment, Zora asserts that the circuit court erred in two regards.  First, she asserts the court erroneously exercised its discretion when it concluded that her failure to comply with its order to appear in person at the February 19th hearing was done in bad faith and constituted egregious conduct.  In support, Zora asserts that pursuant to WIS. STAT. § 805.03 and cases such as *Mable K.*, 346 Wis. 2d 396, ¶70, granting default judgment in a TPR case as a sanction is limited to those circumstances in which a default judgment is "just"—in other words, where a party acted egregiously or in bad faith.  Here, she says, the court erroneously exercised its discretion because it "failed to consider undisputed facts relevant to its determination of whether [her] conduct was 'egregious and without justifiable excuse,' including [her] travel hardship, and the fact that the court had allowed [her] to appear at the first three

---

[13] Zora presents these issues in the opposite order; however, this court summarizes them consistent with the order in which they are addressed in this opinion.

hearings by Zoom." In particular, Zora focuses on what she refers to as the court having "dismissed" her "travel hardship out of hand as her 'not having a ride, essentially[,]'" and she further argues that the court failed to consider alternate options she had suggested, that the court failed to directly discuss travel issues with Zora herself, and that the court disregarded the fact that Zora has neither a vehicle nor a driver's license.

¶26 In regard to her second default-related argument, Zora asserts the circuit court erred as a matter of law because it granted the default judgment prior to finding grounds for termination of her parental rights contrary to cases such as *Evelyn C.R.*, 246 Wis. 2d 1, ¶¶24-25. According to Zora, the court's failure to comply with this required procedure "necessitates reversal."

¶27 Zora also challenges the circuit court's conclusion that because this is an ICWA/WICWA case that the court believed required her to specifically sign form IW-1637, Zora was required to appear in person to voluntarily consent to the termination of her parental rights. She says that because the court misconstrued ICWA's and WICWA's requirements, the TPR order "is invalid" because it "violated the state and federal Indian Child Welfare Acts." Essentially, she raises a similar argument to that raised in the underlying proceedings—that neither 25 U.S.C. § 1913(a) nor WIS. STAT. § 48.028(5)(b) require anything more than that "consent … be: (1) in writing; (2) recorded before a judge[;] and (3) accompanied by the judge's certification that the parent understood both the terms and consequences of their consent"—and that the court erred in construing these requirements as including an in-person element.

¶28 Neither DHHS nor the GAL submitted briefs in response to Zora's arguments. Rather, both filed letters simply stating that neither would be filing a

response brief. Specifically, DHHS stated "it will not be filing a brief because its interests are not affected by the issues raised on appeal," and the GAL stated that "after reviewing the record and the notice of appeal, [the GAL] take[s] no issue with the appeal and will not be filing a brief in this matter."

¶29 Before turning to the issues presented on appeal, this court notes it could summarily reverse the order terminating Zora's parental rights based on DHHS's and the GAL's election to not file responses. *See **Raz v. Brown***, 2003 WI 29, ¶18, 260 Wis. 2d 614, 660 N.W.2d 647 (appellate courts may exercise discretion and summarily reverse a circuit court order as a sanction where respondent has abandoned the appeal). However, because the same issues presented on appeal are likely to arise should this court summarily reverse the circuit court's order, this court will address the issues presented for the purpose of judicial economy.

### A. ICWA and Basic TPR Principles

¶30 ICWA sets forth the minimal federal standards a state court must apply in any state court proceeding involving an Indian child that meets the definition of a "child custody proceeding" as defined in 25 U.S.C. § 1903(1). TPR proceedings fall within that definition. 25 U.S.C. § 1903(1)(ii). Although Wisconsin state courts must comply with ICWA's requirements in TPR proceedings, ICWA does not preempt WIS. STAT. ch. 48, the Children's Code, and Wisconsin statutes can be harmonized with ICWA by applying any state law safeguards beyond those ICWA mandates. ***I.P. v. State***, 166 Wis. 2d 464, 472-73, 480 N.W.2d 234 (1992). Accordingly, in a TPR proceeding in which ICWA applies, the party seeking termination of parental rights must establish ICWA's

substantive and procedural requirements, as well as proving the grounds for termination of parental rights under state law. *See id.* at 473-74.

¶31 It is well-established under Wisconsin law that "[t]ermination of parental rights permanently extinguishes 'all rights, powers, privileges, immunities, duties and obligations existing between parent and child.'" *Steven V. v. Kelley H.*, 2004 WI 47, ¶21, 271 Wis. 2d 1, 678 N.W.2d 856 (quoting WIS. STAT. § 48.40(2)). Consequently, "[p]arental rights termination adjudications are among the most consequential of judicial acts, involving as they do 'the awesome authority of the State to destroy permanently all legal recognition of the parental relationship.'" *Steven V.*, 271 Wis. 2d 1, ¶21 (quoting *Evelyn C.R.*, 246 Wis. 2d 1, ¶20).

¶32 TPR proceedings in Wisconsin require a two-step process. *State v. Shirley E.*, 2006 WI 129, ¶26, 298 Wis. 2d 1, 724 N.W.2d 623. First, the factfinding or grounds phase "consists of an evidentiary hearing to determine whether adequate grounds exist for the termination of parental rights." *Id.*, ¶27. WISCONSIN STAT. § 48.415 provides multiple statutory grounds upon which a petition for the involuntary termination of parental rights may be based. If the petitioner "demonstrate[s] by clear and convincing evidence" that such grounds exist, "the circuit court 'shall find the parent unfit.'" *Shirley E.*, 298 Wis. 2d 1, ¶27 (quoting WIS. STAT. § 48.424(4)). During this first stage, "the parent's rights are paramount." *Shirley E.*, 298 Wis. 2d 1, ¶27 (citation omitted). If the circuit court determines a parent is unfit, the second phase, disposition, "consists of another evidentiary hearing in which the circuit court determines whether termination of parental rights is in the child's best interests." *Id.*, ¶28. Although "[t]he child's interests are paramount at this stage," "the parent has a right to present evidence and be heard." *Id.*

*B. The Circuit Court Erroneously Exercised its Discretion When it Entered Default Judgment Against Zora.*

       1.  Default Judgment Based on Failure to Comply with the Order to Appear

¶33    As set forth above, Zora sought to consent to a voluntary termination of her parental rights to Luther. Although she had submitted a detailed, multi-page signed document to the circuit court consenting to the voluntary termination, the court ultimately ordered Zora to appear in person to sign a specific form, apparently based on the court's belief that because ICWA and WICWA applied in this matter, Zora could only voluntarily consent to do so by signing this specific form in person before the court. The Order to Appear warned Zora that "[f]ailure to appear may result in the Court entering a judgment of default against" her. (Formatting altered.)

¶34    WISCONSIN STAT. § 805.03 permits circuit courts to grant a default judgment as a sanction where a party fails to comply with a court order. As specifically relevant here, § 805.03 provides that "for failure of any party to … obey any order of court, the court in which the action is pending may make such orders in regard to the failure *as are just*, including but not limited to orders authorized under s. 804.12(2)(a)." (Emphasis added.) Our supreme court has confirmed that a circuit court may grant a default judgment pursuant to § 805.03 as a sanction in a TPR proceeding; however, it has emphasized that pursuant to that statute, such sanctions must be "'just.'" **Mable K.**, 346 Wis. 2d 396, ¶69.[14]

---

[14] *See also* **Evelyn C.R. v. Tykila S.**, 2001 WI 110, ¶17, 246 Wis. 2d 1, 629 N.W.2d 768 ("[A] circuit court has both inherent authority and statutory authority under WIS. STAT. §§ 802.10(7), 804.12(2)(a), and 805.03 to sanction parties for failing to obey court orders." (footnotes omitted)).

As the *Mable K.* court explained, "[i]n order for a sanction dismissing a civil case to be 'just,' the non-complying party must act 'egregiously or in bad faith.'" *Id.* (citation omitted); *see also Shirley E.*, 298 Wis. 2d 1, ¶13 n.3 (applying same requirement to default judgment at TPR factfinding hearings).

¶35 The *Mable K.* court further elaborated that a "circuit court may make a finding of egregiousness" if it "concludes that a party's failure to follow court orders, though unintentional, is 'so extreme, substantial and persistent' that the conduct may be considered egregious[.]" *Mable K.*, 346 Wis. 2d 396, ¶70 (citation omitted). A circuit court may find "bad faith, which by its nature cannot be unintentional conduct[,]" if it "find[s] that the noncomplying party 'intentionally or deliberately' delayed, obstructed, or refused to comply with the court order." *Id.* (citation omitted). An appellate court will uphold a default finding if a there is a reasonable basis for the circuit court's conclusion that the conduct in question was egregious and without "clear and justifiable excuse." *See Hudson Diesel, Inc. v. Kenall*, 194 Wis. 2d 531, 542-43, 535 N.W.2d 65 (Ct. App. 1995).

¶36 Having reviewed the specific conduct at issue and the Record as a whole, this court concludes there is no reasonable support for the circuit court's finding that Zora's conduct in failing to appear in person for the February 19th hearing, contrary to the circuit court's order requiring her to do so, amounted to bad faith or egregious conduct under the circumstances present here.

¶37 Importantly, in the days immediately prior to the February 19th hearing, Zora's counsel submitted two letters to the court—the first explaining that due to unforeseen circumstances, Zora's ride would no longer be able to accommodate the February 19th hearing and suggesting multiple alternatives for

February 17th and 18th, and the second explaining that because her February 17-18th trial had been adjourned, she was requesting that the dispositional hearing be rescheduled. The court, which had been made aware over the course of proceedings that Zora encountered numerous challenges in securing transportation to Sheboygan County—such as not having a driver's license, not having a vehicle, and a lack of familial support—therefore knew prior to the scheduled hearing that Zora would be unavailable despite the order to appear. This was not a circumstance in which Zora simply failed to appear without any explanation or failed to seek alternate arrangements to proceed with voluntarily consenting to the termination, and it was not a circumstance in which Zora had repeatedly failed to comply with the circuit court's order; rather, it was the first.[15]

¶38 Zora's conduct throughout the underlying proceedings is also a relevant consideration as to whether her failure to appear at the February 19th hearing amounted to egregious conduct or bad faith under these circumstances. Here, Zora had appeared via Zoom for multiple prior hearings, thus exhibiting her

---

[15] While there seemingly is no threshold or minimum number of times a party can fail to comply without being subject to repercussions, the conduct ultimately must be egregious or done in bad faith and without a justifiable excuse to warrant default judgment being entered. *See **Dane County DHS v. Mable K.***, 2013 WI 28, ¶70, 346 Wis. 2d 396, 828 N.W.2d 198. While there may be circumstances in which a single violation meets this standard, there also may be times when a single violation does not. The Record in this case confirms that the conduct at issue here falls within the latter group.

This court also notes that despite Zora having requested that the circuit court schedule a new date for the disposition hearing based on her unavailability on February 19th, the circuit court disregarded her request and instead proceeded to schedule a motion hearing on DHHS's forthcoming default motion for the following week, commenting that Zora would have "another chance to show up" the following week despite not having shown *any apparent regard to whether Zora would actually be able to secure transportation*. The circuit court seemed indifferent to Zora's circumstances in that regard, as reflected in comments such as "[w]ell there is public transportation" without any apparent consideration of whether public transportation from Michigan's Upper Peninsula to Sheboygan County was either available or feasible.

interest in and willingness to participate in these proceedings. Additionally, her continued desire to do so despite not having appeared in person for the February 19th hearing is evident in her prehearing request for an adjournment to give her additional time to make alternate arrangements.

¶39 Based on the foregoing, the Record unquestionably belies the circuit court's apparent conclusion—which it referenced in concluding that Zora's failure to appear in person was "a demonstration of bad faith" and that her conduct was "egregious" and without "clear or justifiable excuse"—that Zora's reason for not being able to attend in person as ordered essentially amounted to Zora simply believing "she should never be expected to be in court, in person" "because she lives three and a half or three hours and forty-five minutes away[.]" This was clearly not the case, as Zora undisputedly had planned to travel from Michigan to Sheboygan County to appear in person, and when that fell through due to circumstances largely outside of her control, she provided the court with a detailed explanation in advance of the hearing and also asked the court for an adjournment. Accordingly, there was no reasonable basis for the court's conclusion that Zora's conduct amounted to bad faith, that it was egregious, and that it was without justifiable excuse; therefore, the court erred in granting default judgment against Zora under these circumstances.

¶40 That conclusion, however, does not end the analysis, as this court must also determine whether "the error contributed to the outcome of the action or proceeding at issue." *Evelyn C.R.*, 246 Wis. 2d 1, ¶28; WIS. STAT. § 805.18(2) (judgment shall not be reversed unless "after an examination of the entire action or proceeding, it shall appear that the error complained of has *affected the substantial rights* of the party seeking to reverse or set aside the judgment, or to secure a new trial" (emphasis added)). Here, there is no question that the circuit court's

erroneous exercise of discretion affected Zora's substantial rights, as the default judgment ultimately resulted in an *involuntary* termination of Zora's parental rights to Luther despite the fact that Zora wished to *voluntarily* consent to the termination of her parental rights—a distinction that carries potentially great significance under WIS. STAT. § 48.415(10), which identifies a prior involuntary termination of parental rights as grounds for termination of parental rights in subsequent proceedings. Therefore, the circuit court's erroneous exercise of discretion in granting the default judgment was not harmless. Accordingly, this court reverses the circuit court's order granting default judgment.

### 2. Default Judgment Prior to Establishing Grounds Existed

¶41 Moreover, the circuit court also erroneously exercised its discretion when it granted the default judgment *before* establishing that grounds for termination of Zora's parental rights existed. It has long been settled under Wisconsin TPR law that a court erroneously exercises its discretion when it finds a parent in default *prior to* taking evidence regarding the grounds alleged. *See Evelyn C.R.*, 246 Wis. 2d 1, ¶¶24-25; *Shirley E.*, 298 Wis. 2d 1, ¶50. This remains true even where a "violation of the order for personal appearance supplie[s] the circuit court with adequate cause to sanction [a parent] by means of a default judgment."[16] *See Evelyn C.R.*, 246 Wis. 2d 1, ¶26. However, entering a default judgment prior to hearing any evidence as to grounds is precisely what occurred here, and the court therefore erroneously exercised its discretion when it found Zora to be in default at the February 25th hearing.

---

[16] As explained above, however, default judgment as a sanction for failing to comply with the circuit court's order constituted an erroneous exercise of discretion under the circumstances here.

¶42    This error, however, was not prejudicial because the testimony presented at the later disposition hearing essentially cures the circuit court's failure to establish that grounds for termination existed before entering default. *See **Id.**,* ¶¶28-33 (holding that when testimony exists supporting grounds for termination at subsequent hearings, the circuit court's procedural error is harmless). This does not, however, negate this court's conclusion as stated above that the circuit court erroneously exercised its discretion—and that such error was *not* harmless—in regard to entering a default judgment as a sanction under these circumstances.[17]

---

[17] It is also evident from having reviewed the Record that the circuit court likewise erred during the best interests phase of the underlying proceeding. Zora did not specifically raise this point; however, this court notes the proper procedure for circuit courts to follow during the best interests phase in the hope that it will assist the court on remand should this matter proceed in a contested posture.

Whether termination of parental rights is in the child's best interests is "discretionary with the circuit court." *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475. This court will not overturn the circuit court's decision as long as the court properly exercised its discretion by considering the pertinent facts, applying the proper standard of law, "and, using a demonstrated rational process, reach[ing] a conclusion that a reasonable judge could reach." *Bank Mut. v. S.J. Boyer Constr., Inc.*, 2010 WI 74, ¶20, 326 Wis. 2d 521, 785 N.W.2d 462.

In making the best interests determination, the circuit court must consider the six statutory factors set forth in WIS. STAT. § 48.426(3): (a) the child's likelihood of adoption after termination; (b) the child's age and health at the time of disposition and when removed from the home, if applicable; (c) whether the child has substantial relationships with the parent or other family members and whether severing these relationships would be harmful to the child; (d) the child's wishes; (e) the duration of the child's separation from the parent; and (f) "[w]hether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements." *See also Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶¶28-30, 255 Wis. 2d 170, 648 N.W.2d 402. In considering these factors, "[t]he court should explain the basis for its disposition … *by alluding specifically to the factors* in WIS. STAT. § 48.426(3) and any other factors that it relies upon in reaching its decision." *Julie A.B.*, 255 Wis. 2d 170, ¶30 (emphasis added).

In the underlying proceeding, the circuit court did not sufficiently consider the best interests factors as required by statute. To the contrary, the court entirely failed to comply with the aforementioned procedure and instead stated only "that it is in the best interest of the child that the parental rights be terminated" without any reference to the statutory factors whatsoever.

*C. The Circuit Court Erroneously Concluded Zora was Required to Appear in Person for Voluntary Termination of Parental Rights Under ICWA/WICWA.*

¶43     Although this court's reversal of the default judgment entered against Zora is dispositive and it is therefore unnecessary to address the merits of Zora's alternate argument—that the circuit court failed to comply with ICWA/WICWA when it required her to appear in person to voluntarily consent to the termination of her parental rights,[18] it appears likely that this issue will again arise on remand.  Accordingly, for the purpose of judicial economy, this court will briefly address this issue.

¶44     At the January 23rd hearing at which Zora sought to voluntarily consent to the termination of her parental rights, the circuit court indicated that because "this is an Indian Child Welfare Act case[,]" Zora "has to be here in person" because "[t]here's a specific form that needs to be completed that [Zora] has to sign in front of me and then I have to sign an order form indicating that she did review that and sign it in front of me."  The referenced form is IW-1637, entitled "Consent to Termination of Parental Rights (Judicial) Indian Child Welfare Act."[19]  Despite concluding that Zora was required to appear before it in person to proceed with the voluntary consent, it does not appear that the court actually considered the relevant ICWA and WICWA statutory language and what

---

[18] *See* ***State v. Lickes***, 2021 WI 60, ¶33 n.10, 397 Wis. 2d 586, 960 N.W.2d 855 ("Issues that are not dispositive need not be addressed." (quoted source omitted)); ***Martinez v. Rullman***, 2023 WI App 30, ¶5, 408 Wis. 2d 503, 992 N.W.2d 853 (this court decides cases on the narrowest possible grounds).

[19] A copy of form IW-1637 can be found on the Wisconsin Court System's webpage at https://www.wicourts.gov/formdisplay/IW-1637.pdf?formNumber=IW-1637&formType=Form&formatId=2&language=en (last visited Nov. 4, 2025).

those statutes require. Rather, it appears that the court's conclusion was based solely on the existence of IW-1637.

¶45 As Zora sets forth in her appellate brief, Congress enacted ICWA "'to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'" *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989) (citation omitted). ICWA therefore sets forth minimum standards from removing Indian children from their families and placing them outside their familial homes. *See* 25 U.S.C. §§ 1911-1913. Wisconsin's corresponding statute can be found at WIS. STAT. § 48.028. ICWA supersedes the Wisconsin statutes unless those statutes "provide[] a higher standard of protection for the rights of an Indian child's parent or Indian custodian than the rights provided under [ICWA]," and under such circumstances, "the court shall apply the standard under [WIS. STAT. ch. 48]." Sec. 48.028(10).

¶46 Although the circuit court did not tether its conclusion that ICWA and/or WICWA required Zora to appear in person to any particular statutory language, the following appears to be the relevant language:

> Where any parent or Indian custodian voluntarily consents to a … termination of parental rights, such consent shall not be valid unless *executed in writing and recorded before a judge of a court of competent jurisdiction* and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian. The court shall also certify that either the parent or Indian custodian fully understood the explanation in English or that it was interpreted into a language that the parent or Indian custodian understood. Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid.

28

25 U.S.C. § 1913(a) (emphasis added). WISCONSIN STAT. § 48.028(5)(b), as relevant to the issue presented here, is substantially identical:

> A voluntary consent by a parent to a termination of parental rights under s. 48.41(2)(e) is not valid unless the consent is *executed in writing, recorded before a judge*, and accompanied by a written certification by the judge that the terms and consequences of the consent were fully explained in detail to and were fully understood by the parent.

(Emphasis added.) WISCONSIN STAT. § 48.41(2)(e), in turn, establishes that § 48.028(5)(b) governs the process for voluntary consent to termination of parental rights "[i]n the case of an Indian child[.]" To determine whether these provisions required Zora to appear in person, this court must construe the italicized language above.

¶47 "As with every statutory interpretation case, we begin with the statutory text[,]" *State v. Brott*, 2023 WI App 45, ¶12, 409 Wis. 2d 96, 996 N.W.2d 78, *review denied*, 2024 WI 12, 6 N.W.3d 875, and the framework we apply in interpreting statutory language is well known and oft repeated. When reviewing statutory language, appellate courts "ascertain and apply the plain meaning of the statutes as adopted by the legislature." *White v. City of Watertown*, 2019 WI 9, ¶10, 385 Wis. 2d 320, 922 N.W.2d 61. "[S]tatutory interpretation 'begins with the language of the statute[,]'" and the "language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted) ("Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of

surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results."). "To determine common and approved usage, we consult dictionaries." *Sanders v. State of Wis. Claims Bd.*, 2023 WI 60, ¶14, 408 Wis. 2d 370, 992 N.W.2d 126; *State v. McKellips*, 2016 WI 51, ¶32, 369 Wis. 2d 437, 881 N.W.2d 258. "To determine the meaning of legal terms of art, we consult legal dictionaries." *Sanders*, 408 Wis. 2d 370, ¶14.

¶48 A statute is unambiguous if the foregoing interpretative process "'yields a plain, clear statutory meaning[.]'" *Kalal*, 271 Wis. 2d 633, ¶46 (citation omitted). If a statute "is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history." *Id.* "[A] statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." *Id.*, ¶47. "[D]isagreement about the statutory meaning" "is not enough" to render a statute ambiguous. *Id.* Rather, "the test for ambiguity examines the" statutory language "to determine whether 'well-informed persons *should have* become confused,' that is, whether the statutory … language *reasonably* gives rise to different meanings." *Id.* (quoted source omitted; omission in original).

¶49 Both 25 U.S.C. § 1913(a) and WIS. STAT. § 48.028(5)(b) unambiguously require that the voluntary consent to termination of parental rights involving an Indian child be executed in writing. What is less clear, however, is whether the language "recorded *before* a judge" requires that the parent voluntarily consenting to the termination of parental rights execute the written document in the judge's physical presence or whether it is instead sufficient that the judge be able to see the parent do so via some type of remote, audiovisual means. The word "before" is commonly used in everyday language, and therefore this court may consult a nonlegal dictionary to determine meaning. *See Kalal*, 271

Wis. 2d 633, ¶46; *Sanders*, 408 Wis. 2d 370, ¶14; *McKellips*, 369 Wis. 2d 437, ¶32.

¶50     As relevant here, the Merriam-Webster Dictionary defines "before" as including "in front of," and "in the presence of." *Before*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/before (last visited Nov. 4, 2025). Merriam-Webster also defines "before" as meaning "under the jurisdiction or consideration of" and offers the example of "the case *before* the court." *Id.* The Oxford English Dictionary similarly includes "in front," "[i]n a person's presence," and "[t]o a person's face" among its definitions of "before." *Before*, Oxford English Dictionary, https://www.oed.com/dictionary/before_adv?tab=meaning_and_use#24486611 (last visited Nov. 4, 2025).[20] These definitions confirm that "before," as used in the context used of 25 U.S.C. § 1913(a) and WIS. STAT. § 48.028(5)(b), require that the parent execute the writing "in front of" or "in the presence of" the court presiding over the matter. Unfortunately, these definitions do little to clarify whether that means physically in the same location as the court or simply in a manner in which the court can visibly observe the execution. Both are reasonable, and the statute is therefore ambiguous.

¶51     There appears to be very little guidance on this issue. However, for the reasons that follow, this court concludes that interpreting 25 U.S.C. § 1913(a) and WIS. STAT. § 48.028(5)(b) as requiring only that the written execution occur

---

[20] The same or substantially similar definitions are also found in the American Heritage Dictionary of the English Language. *See Before*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=before (last visited Nov. 4, 2025).

31

*visibly*—not *physically*—in the circuit court's presence is the more reasonable interpretation.

¶52 First, this court looks to *In re B.A.*, 3 Am. Tribal Law 39 (Tribal Court of the Confederated Tribes of the Grand Ronde Community 2001), for its persuasive value. There, the issue before the Tribal Court was whether a parent "relinquish[ing] … parental rights to an Indian child [could do so] telephonically" in a voluntary termination of parental rights proceeding. *Id.* In *In re B.A.*, the parent seeking to voluntary terminate parental rights was incarcerated and, for various reasons, did not want to be transported so that she could physically appear before the court in the termination of parental rights proceeding. *Id.* Ultimately, the Tribal Court looked to 25 U.S.C. § 1913(a) and concluded that ICWA did not allow a parent to voluntarily consent to the termination of parental rights *telephonically*. *In re B.A.*, 3 Am. Tribal Law at 40-41. The Tribal Court explained that this was so because in determining whether a parent was coerced and whether the parent was voluntarily consenting to the termination, it was necessary to "see the parent as s/he signs her/his relinquishment papers" and that "the Court must witness [the] process to evaluate the parent's attitude and intent." *Id.* at 41. It therefore held that the "relinquishment of … parental rights to … Indian children must be executed in the presence of the Tribal Court Judge." *Id.*

¶53 Notably, however, the Tribal Court identified a circumstance in which "[a]n exception to *actual presence* of a parent *in the Courtroom* might be made"—"a video conference hearing," which it noted "might resolve the issues." *Id.* (emphases added). The Tribal Court further recognized that "there may be some other method devised by which a Judge could actually assess the parent visually." *Id.* *In re B.A.* therefore suggests that ICWA requires only that the court presiding over a voluntary termination of parental rights involving an Indian

child be able to visibly witness the parent execute the written consent—not that the parent must do so while being physically present with the judge in the actual courtroom.

¶54    WISCONSIN STAT. § 48.41(2) as a whole also supports a similar conclusion. Section 48.41(2) identifies specific circumstances in which a circuit "court may accept a voluntary consent to termination of parental rights[.]" As explained above, where the voluntary consent involves an Indian child, § 48.41(2)(e) requires that the consent be done in accordance with WIS. STAT. § 48.028(5)(b). In the case of a non-Indian child, however, a parent is not necessarily required to physically appear before the court. Specifically, § 48.41(2)(a)-(b) provide as follows:

> **(a)** The parent appears personally at the hearing and gives his or her consent to the termination of his or her parental rights. The judge may accept the consent only after the judge has explained the effect of termination of parental rights and has questioned the parent, or has permitted an attorney who represents any of the parties to question the parent, and is satisfied that the consent is informed and voluntary.

> **(b)** *If the court finds that it would be difficult or impossible for the parent to appear in person at the hearing*, the court may do any of the following:

> **1.** Accept the written consent of the parent given before an embassy or consul official, a military judge, or a judge of any court of record in another county or state or a foreign jurisdiction. This written consent shall be accompanied by the signed findings of the embassy or consul official or judge who accepted the parent's consent. These findings shall recite that the embassy or consul official or judge or an attorney who represents any of the parties questioned the parent and found that the consent was informed and voluntary before the embassy or consul official or judge accepted the consent of the parent.

> **2.** *On request of the parent, unless good cause to the contrary is shown, admit testimony on the record by* telephone or *live audiovisual means* as prescribed in s. 807.13(2).

Sec. 48.41(2)(a)-(b) (emphases added). Notably, § 48.41(2)(b)2 recognizes that not only are there circumstances in which requiring a parent to appear in person to voluntarily consent to the termination of parental rights may be "difficult or impossible," but also that alternatives to physically appearing before a tribunal, including audiovisual means, exist.

¶55 To conclude that WIS. STAT. § 48.41(2)(a)-(b) provide for greater flexibility for parents of non-Indian children seeking to voluntarily consent to the termination of their parental rights than to parents of Indian children seeking to voluntarily consent would be unreasonable, particularly given the consequences of an involuntary termination of parental rights on subsequent cases. *See* WIS. STAT. § 48.415(10). Moreover, while § 48.41(2)(e) and WIS. STAT. § 48.028(5)(b) read together are silent as to whether actual physical presence in the courtroom with the judge is required, as our supreme court recognized in *Shirley E.*, the legislature can "expressly state[]" when it wishes for "a parent's appearance in person[.]" *See Shirley E.*, 298 Wis. 2d 1, ¶44. The legislature expressed no such command in voluntary termination of parental rights cases involving Indian children, and that silence, combined with the persuasive rationale provided in *In re B.A.* and the various methodologies provided for in § 48.41(2)(a)-(b), confirm that the more reasonable interpretation of what it means for written execution to be "recorded *before* judge" where ICWA and WICWA apply is that it requires only that the judge be able to visibly witness the written execution—*not* that it must occur in the judge's physical presence.

¶56 Based on the foregoing, to the extent the circuit court concluded Zora was *required* to physically appear before it in order to voluntarily consent to the termination of her parental rights based on ICWA and WICWA—or, perhaps more accurately, based on its reliance on the existence of a specific form—that conclusion was erroneous.[21] Accordingly, should Zora wish to proceed with a voluntary termination of parental rights on remand, she should be allowed the opportunity to do so via audiovisual means.

## IV. CONCLUSION

¶57 In summary, the circuit court erroneously exercised its discretion when it entered default judgment against Zora following her failure to comply with an order to appear in person because the Record confirms that Zora's conduct was neither egregious nor done in bad faith. That erroneous exercise of discretion was not harmless, and the default judgment is therefore reversed. Moreover, this court concludes that neither ICWA nor WICWA require the parent of an Indian

---

[21] Interestingly, Form IW-1637, does not specifically state anywhere within its four corners that a parent in an ICWA/WICWA case is required to appear in person in order to voluntarily consent to the termination of parental rights. Not only does that form *not* contain any such requirement, it also cites to three state and federal statutes at the bottom of each page: WIS. STAT. § 48.028(5)(b), WIS. STAT. § 48.41(2)(b), and 25 U.S.C. § 1913. It would make little sense for this form to reference § 48.41(2)(b)—the statute that provides alternate means for a parent to consent to voluntary termination of parental rights in a non-Indian child case where it may "be difficult or impossible for the parent to appear in person at the hearing"—if those provisions did not also apply to cases implicating § 48.028(5)(b) and 25 U.S.C. § 1913, the other two statutes referenced thereon. It is possible that the circuit court reached its conclusion based on the language in the "CERTIFICATE OF JUDGE" box that states that "[t]he above named parent *appeared* before me on this date." (Emphasis added.) However, a party can "appear" before a court both in person and via remote means, and, for the reasons set forth herein, this cannot be construed to mean that ICWA and WICWA require that a parent physically appear *in person* in voluntary consent cases. *See* Form IW-1637, available at https://www.wicourts.gov/formdisplay/IW-1637.pdf?formNumber=IW-1637&formType=Form&formatId=2&language=en (last visited Nov. 4, 2025).

child to physically appear in person for the purpose of voluntarily consenting to the termination of parental rights. Accordingly, this matter is reversed and remanded for further proceedings consistent with this decision.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.